SHEPARD & GLUCK *v.* J. B. THOMAS.*

*(Jackson.* April Term, 1922.)

1. **APPEAL AND ERROR.** Writ of error allowed on pauper's oath will not be dismissed for nonresidence where oath of residence is not controverted.

   A motion to dismiss a writ of error for nonresidence of plaintiff in error because no bond was filed, but only a pauper's oath, will be denied where the assertion in the oath that defendant is a resident is not controverted. (*Post, p.* 341.)

2. **JURY.** Right to jury trial in chancery cases stated.

   Under Public Laws 1919, chapter 90, and before its repeal in 1921, defendant in equity could have a jury in any case in which the chancery court had jurisdiction under Laws 1877, chapter 97, by an order transferring the cause to the circuit court, but not in causes in which the chancery court had original jurisdiction prior to the act of 1877, as for enforcement of an equitable lien. (*Post, pp.* 341, 342.)

   Acts cited and construed: Acts 1919, ch. 90; Acts 1877, ch. 97.

   Cases cited and approved: Miller v. Washington County, 143 Tenn. 488; Exum v. Griffis Newbern Co., 144 Tenn., 240.

3. **JURY.** Defendant demanding jury when not entitled and acquiescing in trial held precluded from objecting.

---

* On presumption as to law of other state or country see notes 21 L. R. A., 467; 67 L. R. A., 33; 34 L. R. A. (N. S.), 261 and 38 L. R. A. (N. S.), 40.

On conflict of laws as to dealings in futures see notes 64 L. R. A., 160 and 46 L. R. A. (N. S.), 650.

On right of principal who has placed money in hands of broker for dealing in futures to compel its return see note 13 L. R. A. (N. S.), 267.

Shepard & Gluck v. Thomas.

Where defendant demanded a jury while Public Laws 1919, chapter 90, was in force, not entitling him thereto, and acquiesced in jury trial after repeal of said act when he was entitled to a jury, he will not be heard to object that the trial by jury was improper and that its verdict was advisory only. (*Post, pp.* 342-346.)

4. **EVIDENCE. Laws of foreign State presumed same as law of forum.**

Where the laws of a foreign State involved in a controversy are not shown, they are presumed to be the same as the law of the forum. (*Post, pp.* 346-348.)

5. **GAMING. Deal in futures contemplating delivery and acceptance held valid.**

Under Public Laws 1919, chapter 94, relating to orders to buy or sell commodities for future delivery, executed by agent or broker upon a legitimate exchange providing that the agent or broker shall not be liable for money lost by such party in any such contract, such deal is not a gambling contract where there is intention to make and accept delivery. (*Post, pp.* 346-348.)

Acts cited and construed: Acts 1919, ch. 94.

Case cited and approved: Coles v. Morrow, 130 Tenn., 700.

6. **GAMING. Contract of Mississippi dealing with futures void only when delivery not intended.**

Under Code Miss. 1906, section 2303, a contract dealing with futures is void only when at the time thereof the parties did not intend that the commodity was actually to be delivered in kind and price paid. (*Post, pp.* 348, 349.)

Code cited and construed: Sec. 2303 (Miss.).

7. **GAMING. Lex loci contractus governs as to nature of transaction but lex fori controls as to evidence.**

While the law of Mississippi governs as to whether a Mississippi contract dealing in futures was a gambling transaction, the further provisions of a statute of that State as to the effect of evidence of no delivery and of the posting of price fluctuations do not govern, but the law of Tennessee controls as to what constitutes evidence of illegal transactions under the Mississippi laws. (*Post, pp.* 349-354.)

Shepard & Gluck v. Thomas.

Cases cited and approved: Jones v. Chicago, etc., Railway Co., 80 Minn., 488; Emery v. Burbank, 163 Mass., 326; Stack v. Detour Lumber Co., 151 Mich., 21; Heaton v. Eldridge, 56 Ohio St., 87.

8. **EQUITY.** Instructions construing pleadings and defining issues held not necessary in view of specific questions submitted.

It was not necessary in equity in which issues were submitted to the jury that the judge should give instructions construing the pleadings for them and clearly define and state to them the issues submitted for their determination, where specific issues by questions and answers were submitted, and they had nothing to do except answer in the affirmative or negative to such questions. (*Post*, p. 354.)

FROM SHELBY.

Appeal from and Error to the Chancery Court of Shelby County.—HON. ISRAEL H. PERES, Judge.

· W. G. CAVETT and H. S. BUCHANAN, for appellant and plaintiff in error.

JOHN D. MARTIN and A. J. DONELSON, for appellees and defendants in error.

MR. L. D. SMITH, Special Justice, delivered the opinion of the Court.

The questions presented in this case arise principally upon the answer and cross-bill of the defendant J. B. Thomas. The original bill was filed by Shepard & Gluck against Thomas to recover on a note of $4,100, and to enforce a lien on and to sell some warehouse receipts issued by the Memphis Terminal Corporation, which had been deposited by the defendant with the complainants as collateral security for the payment of the note. The defendant Thomas admitted the execution of the note and the

Shepard & Gluck v. Thomas.

hypothecation of the warehouse receipts, but by answer set up the claim that the note was executed for a gambling consideration, and that it was therefore void and uncollectible. By his cross-bill he sought to have the note canceled, and also to recover from the complainants the money which he had lost with them in dealings in future contracts for the sale and purchase of cotton. A jury was demanded by the defendant and a jury trial had, and the findings of the jury on the issues submitted to them were considered by the chancellor as being sufficient to authorize a decree in favor of the complainants. From this decree the defendant undertook to appeal to this court. The order allowing the appeal allowed it upon the execution of a bond. The appellant filed a pauper's oath, which the clerk deemed insufficient, and he declined to receive it. The clerk who succeeded him recognized the appeal bond and sent up the transcript. Motion to dismiss the appeal has been filed, based upon the ground that the order allowing the appeal required the execution of a bond and does not permit appeal to be obtained upon the filing of a pauper's oath. In addition to the appeal the defendant has filed the record for a writ of error, which having been granted as a matter of course, the complainants have moved to dismiss because at the time of the institution of the suit the defendant was a nonresident of the State of Tennessee, and no bond has been filed for the writ of error, but only a pauper's oath.

The motion to dismiss the writ of error must be denied because the oath filed shows that at the time thereof. the defendant was a resident of Shelby county, Tenn., and, owing to his poverty, is unable to prosecute the writ of error, and, it being made to appear affirmatively by the affidavit of the defendant that he is a resident of the

State, and that being uncontroverted, his right to prosecute the writ is unquestioned.

Another preliminary question arises, and that is .as to the effect to be given by this court to the verdict of the jury upon which the decree is based; it being contended by the defendant that the verdict of the jury should be considered as only advisory to the chancellor, and not conclusive, because the demand for a jury was made by the defendant in his answer and cross-bill during the time when chapter 90 of the Acts of 1919, abolishing jury trials in chancery courts, was in force. The trial of the cause was had after the repeal of that act in 1921. The original bill was filed June 5, 1920. The answer and cross-bill demanding a jury trial was filed June 10, 1920. By the act of 1919, which was in force at that time, a defendant could have a trial by a jury in any case in which the chancery court acquired jurisdiction by virtue of chapter 97 of the Acts of 1877 by an order made in the chancery court either in term time or in chambers transferring the cause to the circuit court of the county. This right of trial by jury did not exist under the act of 1919 in causes of action in which the chancery court had original jurisdiction prior to the act of 1877. *Miller* v. *Washington County,* 143 Tenn., 488, 226 S. W., 199; *Exum* v. *Griffis Newbern Co.,* 144 Tenn., 240, 230 S. W., 601.

The chancery court did have jurisdiction independently of and prior to the passage of the act of 1877, since the principal purpose was to enforce an equitable lien, and therefore the defendant was not entitled to a jury trial. Neither was he entitled to a jury trial on his cross-bill because the court acquired jurisdiction thereof independently of the act of 1877. The effect of the act of 1919 was

Shepard & Gluck v. Thomas.

to abolish jury trials in all such cases. The complainant could not have a jury trial in the chancery court except in causes where the court had jurisdiction by virtue of the act of 1877, and then only by demanding it in his bill. The defendant could only have a jury trial in causes in which the court had jurisdiction by virtue of the act of 1877, and then only by making demand therefor in his first pleading. It follows, therefore, when a jury was demanded in this cause by the defendant, he was not entitled to a jury trial. No action was taken by either side or by the court upon this demand for a jury trial until after the act of 1919 had been repealed, but when the cause came on the court ordered the jury impaneled, and one was impaneled, and trial had before a jury without any objection or protest upon the part of either party. Under such circumstances the court was justified in assuming that the demand originally made was being renewed. At any rate the defendant, after having made this demand for a jury trial, even though he was not entitled to it at the time it was made, having acquiesced in the interpretation of his rights by the court, will not be heard to say that he did not demand a jury at the time of the trial. After having had his case submitted to a jury under these circumstances and lost, he will not be heard to take advantage of his conduct by reason of the fact that he was not entitled to have what he was asking for. This is especially true since the act of 1919 had been repealed and the law stood at the time of the trial just as it did prior to the passage of the act of 1919, at which time either party was entitled to a jury trial upon demand. We are under the necessity, therefore, of treating the verdict of the jury, concurred in as it was by the chancellor, as conclusive of the fact in issue in so far

as there is any material evidence in the record to sustain it.

Assuming for the present that there is evidence to support the findings of the jury, the facts either conceded or found by the jury are these: The defendant Thomas, whose residence and place of business is in the State of Mississippi, was engaged in buying and selling cotton, and had been for a number of years, being an experienced business man in that line. He had done some business with Shepard & Gluck, a partnership or firm of brokers who carried on the business of acting as agents and brokers for cotton buyers and sellers in the cotton exchange in New Orleans, La. This firm maintained offices in the city of Memphis, Tenn., and also in Clarksdale, Miss. They were members of the New Orleans Cotton Exchange, and did business on the exchange principally by telegraph. In February, 1920, Thomas gave orders to Shepard & Gluck to sell for him on the Exchange three hundred bales of cotton for delivery in the following July. Between that time and April 9, 1920, the market had fluctuated, and the price of cotton advanced to such extent that the brokers required that Thomas put up as a deposit to secure the brokers $1,500 in cash and execute the note sued on in this case, and as collateral thereto he deposited the warehouse receipts referred to. At about the same date Thomas directed his brokers to purchase three hundred bales of cotton for delivery in the following October, and Thomas directed his brokers to stop his losses or close out his contract when cotton reached the sale price of .3925 per pound upon the New Orleans Exchange. On the 15th of April, the price of cotton having reached .3925, his contract for the sale of cotton was disposed of at that price, the transactions having resulted in a loss to Thomas in the sum of $3,781.97, the amount of the decree plus interest.

Certain disputed questions of fact were submitted to the jury.  When narrated, the answers to the various issues are: Shepard & Gluck, as brokers for J. B. Thomas, when they received orders to buy and sell the July and October, 1920, cotton, executed the same.  They executed said orders upon and in accordance with the rules and regulations of the New Orleans Cotton Exchange at New Orleans, La., a legitimate produce, stock, or cotton exchange or board of trade, where the rules and regulations thereof forbade the practice of what is called bucket shopping or bucketing, and where such rules and regulations require both the buyer to accept and the seller to make delivery in kind upon all such transactions entered into upon the floor of such exchange.  The order to sell the July future contract was given to Shepard & Gluck at Memphis, Tenn., and Clarksdale, Miss.  The order given by Thomas to Shepard & Gluck to·buy the July future contract was given at Memphis, Tenn.  Each of these orders was executed and carried out on the floor of the New Orleans Cotton Exchange at New Orleans, La.  When Thomas gave his orders to buy and sell said cotton, he disclosed to Shepard & Gluck his intention to make actual delivery of the cotton sold and to accept actual delivery of the cotton bought.  The persons to whom Shepard & Gluck sold the cotton, as well as the persons from whom they purchased, disclosed their intention to accept delivery and to deliver the actual cotton thus bought and sold.  Shepard & Gluck did not agree to carry the contracts of Thomas until he could order them disposed of or until he was called on for margins if said Thomas would execute the note sued on.  Thomas placed with Shepard & Gluck a stop loss order to purchase for his account three hundred bales of July, 1920, cotton

whenever the market should reach .3925, but this stop loss order was not in force and effect when Shepard & Gluck purchased the three hundred bales of July cotton at .3925. Thomas paid to Shepard & Gluck on margins and losses on the July and October future contracts within ninety days prior to the 10th of June, 1920 (the date of the filing of the cross-bill), the sum of $3,000. It is not a fact that Thomas and buyers and sellers on the Exchange who bought and sold cotton on Thomas' order never at any time intended to receive or deliver the actual cotton, notwithstanding the rules and regulations of the Exchange to the contrary. Neither did Shepard & Gluck knowingly participate in any intention of Thomas or the purchasers or sellers of this cotton not to make delivery or accept the actual cotton. On April 16, 1920, Shepard & Gluck notified Thomas that they had bought in said three hundred bales of July, 1920, cotton for his account. The market price of cotton in July, 1920, at the earliest reasonable time following the receipt of this notice by Thomas that he could have sold the three hundred bales of July cotton in New Orleans was .3925 to .4015, inclusive.

In the brief of counsel for the appellant it is claimed that issue No. 5 submitted to the jury was answered in the negative. This contention is stated in the brief as follows: The jury's verdict "in many respects is contradictory. As to question 5: 'Did the party to whom Shepard & Gluck, or from whom they bought, when executing these orders of Thomas, disclose their intention as to acceptance or delivery of the actual cotton?' Ans. 'No.'" This same issue is quoted in the brief of complainants, and the answer is "Yes." The transcript of the record accords with the contention of the complainants, and the answer is therein shown to be in the affirmative.

Are these gambling contracts? It is contended by the appellant that the statutes of Mississippi govern and control that question. It cannot be successfully contended under the facts found that the contracts were in violation of the laws of Tennessee or Louisiana. The laws of Louisiana on the subject are not shown. They are therefore presumed to be the same as the laws of Tennessee. In Tennessee, as elsewhere, the purchase or sale of commodities for future delivery is perfectly legitimate. It is only when the parties dealing in the futures have no intention of making or accepting delivery of the particular commodity that the transaction is unlawful. Of course, the circumstances and manner of dealing may be looked to in determining the intention of the parties in this regard, but where the fact is established that there was an intention to make and accept delivery of the actual commodity traded in, it is not condemned as a gambling contract. And by our act of 1919 (chapter 94) an order to buy or sell commodities for future delivery, when executed by an agent or broker upon a legitimate exchange, shall be deemed the contract of the principal, and the agent or broker shall not be liable for money lost by such party on any such contract. The act itself provides:

"The plain intent of this section as amended is while declaring unlawful all the transactions conducted in and through a bucket shop as described and defined herein, to make lawful and enforceable and to withdraw from the provisions of the gaming and wagering statutes of this State, all transactions executed upon and in accordance with the rules of a legitimate produce, stock or cotton exchange or board of trade, and this act shall be liberally construed at all times so as to effectuate this object."

The jury's verdict brings this transaction squarely within the statute which makes the contract enforceable and denies liability against the broker. This act further provides that no contract for the purchase or sale of future commodities executed as provided by the act shall be deemed unlawful as lacking the essential elements of actual delivery thereon by reason of the fact the contract was subsequently offset or settled between the members of the Ex-where the only effect of the offset has been to substitute other parties either as buyers or sellers for those with or through whom the transaction was originally made. The jury's verdict brings the case within this provision of the act declaring transactions of this character lawful. *Coles* v. *Morrow,* 130 Tenn., 700, 162 S. W., 577.

If the contracts are not in violation of the laws of Mississippi, it will not be necessary to determine by the laws of what state the question is controlled. The statute of Mississippi (Code 1906, section 2303) on the subject of what constitutes future contracts that cannot be enforced reads as follows:

2303. Future Contracts Not Enforced, etc.—A contract for the purchase or sale of a commodity of any kind, to be delivered at a future date, the parties not intending that the commodity is to be actually delivered in kind and the price paid, shall not be enforced by any court, nor shall any contract of the kind, commonly called 'futures' be enforced, nor shall a contract in this section mentioned be a valid consideration, in whole or in part, for any promise or undertaking, and any person who shall make any such contract and by reason thereof, lose any money, property or other valuable thing, real or personal, and shall pay or deliver the same or any part thereof, may, or his wife or

children may sue for and recover such money, property or other valuable thing so lost and paid or delivered, or any part thereof, from the person knowingly receiving the same, either for himself or as agent for another, together with all costs of suit."

From the section of the Mississippi law just quoted it is readily seen that a contract dealing with futures is void only when at the time of the contract the parties did not intend that the commodity was to be actually delivered in kind and the price paid. According to the findings of the jury, concurred in by the court, the parties in this transaction did at the time intend that delivery should be made in kind and the price paid. So that this contract cannot be avoided by reason of anything found in the statute referred to, if indeed there is any evidence to support the findings of the jury. Chapter 118 of the Acts of 1909 of the Mississippi legislature is not different from that quoted in defining what constitutes an unlawful contract in connection with dealings in future deliveries of commodities. But it is contended that by sections 6 and 7 of said act of 1909 certain acts constitute *prima-facie* evidence that such contracts are void, and that there is no dispute in this record of the existence of such *prima-facie* evidence. These sections provide:

"Sec. 6. That proof of anything of value agreed to be sold and delivered was not actually delivered, and that one of the parties to such an agreement deposited or secured, or agreed to deposit or secure, what are commonly called margins, shall constitute *prima-facie* evidence of the making or negotiating of a contract declared unlawful by the terms of this act.

"Sec. 7. That proof that any person, association of persons or corporation, whether as principal or agent, has

established an office or place where are posted or published from information received, the fluctuating prices of cotton, grain, stocks, bonds, and other commodities or things of value, or either of them, shall constitute *prima-facie* evidence of guilt of the offense prohibited in section 1 of this act."

It is established beyond controversy that the cotton involved here was not actually delivered in kind, and that Thomas, the defendant, did deposit margins to protect his trades. It is furthermore established without controversy that the complainants did have established offices and places where were posted and published from information received the fluctuating prices of cotton and other commodities. So that, if we are bound by the foregoing statutes of Mississippi, and the law of Mississippi controls, then clearly the defendant established the illegality of these contracts. In our opinion these provisions relating to what constitutes evidence of illegal transactions under the Mississippi laws are not binding and cannot govern the decision of the question by the courts of Tennessee, but we are controlled by the law of this State on that subject. We have the fact established in this case by the finding of the jury to be the very opposite of that. The same evidence would have determined to the contrary under the laws of Mississippi. What is sufficient to make out a case, whether certain evidence makes a *prima-facie* case, cannot be determined by the laws of Mississippi, but must be determined by the laws of this State.

The rule which we deem applicable is stated in 5 R. C. L., p. 1045, as follows:

"The weight of authority, as well as sound principles of reason, is in accordance with the rule that questions of evidence are governed by the law of the forum, and that

such law determines the admissibility, competency, quality, and degree of evidence. Whether a witness is competent or not, whether certain matters require to be proved by writing or not, whether certain evidence proves a certain fact or not, are to be determined by the law of the country where the question arises, where the remedy is sought to be enforced, and where the court sits to enforce it. If the law of the forum requires a certain mode of proof, a contract, although valid, cannot be enforced in that jurisdiction without the proof required there. The evidence by which a contract shall be proved is not part of the contract itself, but its admission or rejection becomes a part of the proceeding on the trial, where its competency and sufficiency must be determined. When the required evidence is lacking, the courts must refuse the enforcement of the contract, and it seems clear that a statutory regulation prescribing the mode or measure of proof necessary to maintain an action or defense pertains to the remedy controlling the procedure of the forum in administering the remedy. A statute of the State of the forum in derogation of the rules of evidence as established elsewhere will, for the reason stated, as to contracts entered into in another state, be obeyed and executed in any action brought to enforce such contracts in the forum State."

The cases cited by the author of the article above referred to fully warrant and sustain the principle stated.

*Jones* v. *Chicago, etc., Railway Co.,* 80 Minn., 488, 83 N. W., 446, 49 L. R. A., 640, is directly in point. That was an action to recover damages for personal injuries alleged to have been caused to plaintiff by the defendant's negligence. The accident happened in the State of Wisconsin. Suit was brought in the State of Minnesota. A statute of Wisconsin was set out in the complaint. That

statute provided that every railroad company shall be liable for all damages sustained by any of its employees, without contributory negligence on his part, and such injuries caused by a defect in the equipment or track or appliances required by the company to be used by its employees in or about the business of their employment, if such defect could have been discovered by the company by reasonable and proper care, test, or inspections. The statute further provided that proof of the existence of the defect should be presumptive evidence of knowledge thereof on the part of the company. It was contended for the plaintiff, and the trial court took that view, that that portion of the Wisconsin statute which makes proof of defective appliances presumptive evidence of knowledge entitled him to recover without regard to the rules prevailing in Minnesota. The supreme court of Minnesota held that the portion of the statute referred to was nothing more than a rule of evidence which could not be given extraterritorial effect. Rules of evidence are matters of procedure, therefore governed by the laws of the country where the court sits. The court said:

"Whether a witness is competent or not, whether certain matters require to be proved by writing or not, whether certain evidence proves a certain fact or not, are to be determined by the law of the country where the question arises, where the remedy is sought to be enforced, and where the court sits to enforce it."

In *Emery* v. *Burbank,* 163 Mass., 326, 39 N. E., 1026, 28 L. R. A., 57, 47 Am. St. Rep., 481, the Massachusetts supreme court held that an oral contract to make a will, although valid in the State where it is made, cannot be enforced in Massachusetts against inhabitants of that State, since an action must be controlled by the policy of the

·Massachusetts statute which requires said agreement to be in writing.

In *Stack* v. *Detour Lumber Co.*, 151 Mich., 21, 114 N. W., 876, 16 L. R. A. (N. S.), 616, 14 Ann. Cas., 112, it was held that a general law of the State where a corporation is organized, depriving it of the benefit of the usury laws, does not follow it into another State where it is authorized to do business, so as to prevent it from taking advantage of the local statute against usury in an action to foreclose a mortgage executed and to be performed in that State and secured upon lands there situated.

*Heaton* v. *Eldridge,* 56 Ohio St., 87, 46 N. E., 638, 36 L. R. A., 817, 60 Am. St. Rep., 737, was an action in Ohio on promissory notes, and the defendant set up a counterclaim for damages resulting from the breach of an oral contract. This agreement was made and was to be performed in Pennsylvania, where the law did not require a contract of that kind to be in writing. The statute of frauds was held by the court to be matter of procedure. The writing is not the contract itself, but merely the evidence of the contract; the statute forbidding the maintenance of an action on any agreement unless supported by the required written evidence. The admission or rejection became a part of the proceeding on the trial, where it was held its competency or insufficiency must be determined. 56 Ohio St., 87, 46 N. E., 638, 36 L. R. A., 820, 60 Am. St. Rep., 737.

The cross-bill in this case proceeded upon another theory, and that is that, conceding the contract to be legal, it was breached by the complainants by the sale or transfer of Thomas' contracts before exhaustion of his margin and without his knowledge, and it is contended by Thomas that the answer of the jury to the effect that at the time the contracts were disposed of there was no stop loss order in

effect is conclusive of the breach of the contract and entitles him to a directed verdict. The jury did find that the stop loss order which had been given had been canceled, and that it was not in effect when the contracts were finally closed. But this particular fact is immaterial in the determination of the real question at issue. There may have been no stop loss order in existence, and yet, if there was no breach of the contract which was in existence, no recovery could be had. The jury found as a fact that there was no such breach. An examination of the evidence tends to show that such was the fact. It appears that Thomas made no such contention when payment of his account was demanded, or for some time thereafter, and there is testimony which shows that the contract was finally closed by the direction of Thomas himself. Furthermore, there is no evidence here that the cross-complainant sustained any loss by this particular breach of the contract.

There is an assignment of error that the trial judge failed to construe the pleadings and to clearly define and distinctly state to the jury the issues submitted for their determination. This assignment is overruled. Specific issues by questions and answers were submitted to the jury. They had nothing to do except make an answer in the affirmative or negative to the specific questions asked. It was unnecessary, therefore, to give any detail explanation of the pleadings or of the rules of law which would govern the court in the decision of the case. There is no complaint that the instructions were insufficient with respect to the method to be followed by the jury in ascertaining and determining the proper answers to make.

There is no error in the judgment of the chancery court, and the same will be in all things affirmed, with costs.